IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


TANYA ANDERSON,                          )
                                         )
             Plaintiff,                  )  Case No. CV04-466-HU
                                         )
      vs.                                )    OPINION AND ORDER
                                         )
GERALD SEGAL, M.D.; DANIEL               )
GRUENBERG, M.D.; THE AMERICAN RED        )
CROSS PACIFIC NORTHWEST REGIONAL         )
BLOOD SERVICES,                          )
                                         )
             Defendants.                 )
_____)


William G. Wheatley
Patrick A. Lynd
Jaqua &  Wheatley
825 East Park Street
Eugene, Oregon 97401
      Attorneys for plaintiff

///
///


1   - OPINION AND ORDER

Robert D. Newell
Kevin H. Kono
Davis Wright Tremaine
1300 S.W. Fifth Avenue, Suite 2300
Portland, Oregon 97201
        Attorneys for defendant The American National Red Cross

Larry Brisbee
Drake A. Hood
Brisbee & Stockton
139 N.E. Lincoln Street
Hillsboro, Oregon 97123
        Attorneys for defendant Gerald Segal, M.D.

Kelly A. Giampa
Francie Cushman
Hoffman, Hart & Wagner
1000 S.W. Broadway, 20th floor
Portland, Oregon 97205
        Attorneys for defendant Daniel Gruenberg, M.D.

HUBEL, Magistrate Judge:

        This is a negligence action arising out of plaintiff's donation of bone marrow. Defendants are the American National Red Cross, Gerald Segal, M.D., and Daniel Gruenberg, M.D.[1] All defendants move for summary judgment on the ground that plaintiff's action is barred by the statute of limitations, because she knew, or reasonably should have known, of her injury more than two years before she filed this action. Defendant Segal moves, in the alternative, for partial summary judgment in his favor on plaintiff's allegation of negligence during the bone marrow extraction procedure. Defendant Gruenberg moves, in the

_____

        [1]Legacy Good Samaritan Hospital, Pacific Northwest Regional Blood Services, and the National Marrow Donor Program were originally named as defendants, but have now been dismissed.

2   - OPINION AND ORDER

alternative, for partial summary judgment on the ground that he had no involvement in plaintiff's post-surgical care, so that plaintiff cannot establish the facts necessary to prevail on her allegation that Dr. Gruenberg was negligent in failing to discover the true nature of her injury after the procedure.

Plaintiff filed this action on March 5, 2004, approximately three and a half years after the procedure in which her bone marrow was harvested. She alleges injuries to the bones, muscles, ligaments, tendons and nerves of her hip, spine, sacrum and right sacroiliac joint.

**Factual Background**

In June or July 2000 plaintiff, who had previously registered with the National Marrow Donor Program as a potential marrow donor, was contacted by Delores Rue, the Red Cross bone marrow donor coordinator. On August 1, 2000, plaintiff met with Ms. Rue to receive information about the donation process. At the meeting, plaintiff was given an informational booklet titled, "Now that you are a Match," and reviewed the information with Ms. Rue. She also watched a videotape of an actual procedure.

Plaintiff signed a consent form which stated that she should "expect some discomfort following the donation," including a sore lower back, which would last for a few days or more. Declaration of Patricia McGuire, Exhibit 1, p. 53. She was informed that she might "find it difficult to sit in a chair for

long periods or to climb stairs," and that she would probably be less active than usual for a few days after the donation. Id. The consent form also advised of "more serious complications from the bone marrow donation," which were not expected, but which could occur. These included complications from the anesthesia, infections at the marrow collection site, pain or numbness in a leg, bleeding at the collection site, or "more severe pain than usual." She was also told that "[b]one, nerve or other tissue damage may occur and may require additional medical treatment or physical therapy." Id.

Plaintiff testified that Ms. Rue told her at the August 1, 2000 meeting that to Ms. Rue's knowledge, only one person had suffered an injury from the procedure, and that person was "back on their feet within six months." Anderson deposition at 96:5-8, 207:11-208:3. Plaintiff also testified that Ms. Rue said that, although each person's recovery is different, a donor should fully recover within six weeks. Id. at 96:9-20. Through the meeting with Ms. Rue, plaintiff knew that the potential risks associated with a marrow harvest procedure included disability of up to six months, or even death. Id. at 98:8-21.

Later on August 1, 2000, plaintiff met with defendant Gerald Segal, M.D., the lead physician for the harvest procedure, to receive additional information. Segal Deposition, 49:5-9. She signed a second consent form at that time, which advised that

surgery and anesthesia carried significant risks, including infection and bleeding, insufficient breathing, low blood pressure, irregular heartbeat, coma, convulsion and death. McGuire Declaration, Exhibit 1, p. 55. The consent form also stated that "soreness and bruising in the region of the hip bones can be expected for several days." Id.

On September 22, 2000, plaintiff signed a Verification of Consent indicating that the risks associated with the procedure had been explained, that she had no further questions, and that she consented to the procedure. McGuire Declaration, Exhibit 1, p. 57.

During the harvest procedure, defendant Segal extracted bone marrow from her left iliac crest, and defendant Gruenberg, the assisting physician, extracted bone marrow from plaintiff's right iliac crest.

As primary physician, Dr. Segal was responsible for conducting the preoperative physical examination, obtaining plaintiff's informed consent, and handling any necessary follow-up care. The responsibilities of the assisting physician, Dr. Gruenberg, were limited to the procedure itself.[2]

Plaintiff has testified at her deposition that immediately after the procedure, while still at the hospital, "I just kept

---

[2] Plaintiff has conceded her informed consent claim against Dr. Gruenberg.

telling the nurse that my right side felt like it had been hit by a train and my left side didn't-- I wasn't feeling anything on the left side." Anderson Deposition 112:4-13. On the day of the procedure, as she was leaving the hospital, plaintiff had a conversation with Dr. Segal in the elevator on the way down to her car. Id. 136:18-137:17. She told him her right side hurt. Id. Dr. Segal told her Dr. Gruenberg had performed the procedure on the right side. Id. Plaintiff responded, "Well, good for you for doing the left side, because my left side doesn't hurt." Id.

Plaintiff testified that immediately after the procedure, besides the pain in her right side, her right side was swollen and painful with a large bruise, and she bled through her bandage. Id. 140:17-22. Shortly after the procedure, plaintiff contacted Ms. Rue because she "felt like there was something wrong." Id. 141:24-142:25. She complained to Ms. Rue that she was bleeding through her bandage on the right side, and that she was bruised, and it was "really swollen and painful." Id. at 140:17-141:14. Ms. Rue told plaintiff the bleeding, bruising and pain were normal. Id. 141:15-16.

Plaintiff's husband testified at his deposition:

Q:  When did your wife to your knowledge first believe
    that something had happened incorrectly in the
    surgery?
A:  It was a no-brainer something was wrong with the right
    side, within three days. ...{B]y the end of the month,
    it's not getting any better. ... Something had to be
    wrong with that side, when the other side

was fine. ... You don't have to be a doctor
to know that...

Andrew Anderson Deposition 77:10-19.

Sometime between late November 2000 and January 2001,
plaintiff contacted Delores Rue again, with concerns about
continued pain and swelling. Anderson Dep. 142:18-21. Plaintiff
explained that she called Ms. Rue because "[i]t just didn't feel
right. It was-- in pain and six weeks had gone by. It was longer
than what I had thought would be the normal healing time." Id.
141:24-142:25. Plaintiff testified that she felt at this time
that something had gone wrong in the procedure. Id. Ms. Rue
arranged for plaintiff to see defendant Segal. Id. 141:24-142:11;
144:6-12.

Plaintiff testified that in the months after the procedure,
her condition continued to worsen, that she suffered "throbbing
pain" and could not sleep on her back. Id. 146:1-12.

On January 26, 2001, plaintiff contacted Dr. Segal's office
to schedule an appointment. Segal Deposition 69:19-70:8.
Plaintiff has testified that between the procedure and her first
appointment with Dr. Segal on February 2, 2001, her pain
worsened, but she had not seen any other medical provider.
Anderson Dep. 146:6-12, 147:6-11.

Plaintiff testified:

Q:    [U]p to the time that you first saw Dr. Segal,
      what were the ... complaints or the symptoms

that you were experiencing ... compared to what
            you would have expected, given the information
            given to you before the procedure?
      A:    Oh, I expected there to be pain in the
            beginning. I just didn't expect it to linger on
            for months.

Id. 148:21-149:3.

Dr. Segal examined plaintiff on February 2, 2001, and told her she had "likely had sustained a nerve injury because of the bone marrow harvest," and that "in general these improve over time." Segal Dep. 72:8-20. Plaintiff does not remember any specifics of this visit with Dr. Segal; she remembered only that she "didn't get an answer and [she] was feeling like they didn't know what was wrong." Anderson Dep. 151:19-152:13; 146:16-20; 152:14-25.

Plaintiff had no further consultations with medical professionals until July 19, 2001, when she went to see Dr. Segal again. Anderson Dep. 154:14-20. Sometime between the February 2001 visit and the July 19, 2001 visit, she testified that she began experiencing a burning sensation in her right leg. Id. 153:7-25. A lump also appeared at her incision site. Id. 154:5-7. Dr. Segal had an x-ray taken to "see if there was a bone splinter or a bone spur that had maybe been left that could have been causing the lump." Id. 155:7-13. Dr. Segal later contacted plaintiff about the x-ray, but plaintiff does not recall the

///

content of the conversation, except that it confirmed no medical equipment had been left behind in her body. Id.

At the July 19, 2001 appointment, Dr. Segal referred plaintiff to a neurologist, Dr. Gibbs. Segal Dep. 83:10-14. Plaintiff saw Dr. Gibbs on September 14, 2001. According to plaintiff, Dr. Gibbs "came in, poked [plaintiff] four or five times with a toothpick, did some reflexes on [her] legs, and walked out the door." Anderson Dep. 156:18-157:2; 151:5-7. The appointment lasted less than five minutes. Dr. Gibbs subsequently submitted a report to Dr. Segal recommending that plaintiff be started on Neurontin and concluding that there was "most likely some damage due to ... inflammation and irritation at the incision site." Id. 150:1-4; 157:12-14.

Dr. Segal did not share Dr. Gibbs's report with plaintiff, and did not follow up on Dr. Gibbs's recommendation that she be started on Neurontin. Instead, Dr. Segal told plaintiff he could find nothing wrong. Id. 150:5-7. Plaintiff learned of Dr. Gibbs's report approximately two years later. Id. 150:8-13, 273:24-274:3.

Plaintiff had no further medical treatment until March 12, 2002, when she saw Linda Rose, a chiropractor, after her back went into spasms and her back and hip area locked up. Id. 156:11-15, 162:8-17. Plaintiff asserts that at that visit, she was informed for the first time that her symptoms were caused by improper medical care during the bone marrow donation. She

states, "Prior to that date, I had never been told my condition arose because someone had made a mistake." Plaintiff's Response to Defendant Gruenberg's First Set of Interrogatories, Interrogatory # 3, Affidavit of Francie Cushman, Exhibit E.

## Standards

The statute of limitations in a medical malpractice action is two years. Or. Rev. Stat. § 12.110(4) provides:

> An action to recover damages for injuries to the person arising from any medical, surgical or dental treatment, omission or operation shall be commenced within two years from the date when the injury is first discovered or in the exercise of reasonable care should have been discovered ***

The definition of "injury" involves three elements: 1) harm; 2) causation; and 3) tortious conduct. Gaston v. Parsons, 318 Or. 247, 255 (1994). As the court said in Gaston,

> To discover a particular element of legally cognizable harm, the plaintiff does not need to know to certainty that each particular element exists. The discovery rule is designed to give plaintiffs a reasonable opportunity to become aware of their claim. Actual knowledge that each element is present is not required. On the other hand, a mere suspicion is insufficient to begin the statute of limitations to run. We believe that a quantum of awareness between the two extremes is contemplated by the statute. Therefore, the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements (harm, causation and tortious conduct) exists.

318 Or. at 255-56. [internal citation omitted] In Gaston, the

court pointed out that in most cases, the "inquiry will concern what a plaintiff should have known in the exercise of reasonable care." Id. Relevant to this analysis is a plaintiff's failure to "make a further inquiry if a reasonable person would have done so." Id.

Whether a reasonable person of ordinary prudence would be aware of a substantial possibility of tortious conduct is a question of fact that depends upon the nature of the harm suffered, the nature of the medical procedure, and other relevant circumstances. Id.

### Discussion

### 1.    Motions based on statute of limitations

Defendants assert that plaintiff knew, or in the exercise of reasonable care should have known, of her injury more than two years before filing this action on March 5, 2004. They point to evidence that she felt something had gone wrong with the procedure on her right side, including her conversation with the nurse and with Dr. Segal as she was leaving the hospital. Defendants assert that plaintiff reasonably should have ascribed her injury to the conduct of Dr. Gruenberg on the day of the procedure.

Alternatively, defendants cite to the evidence that as of late 2000 or early 2001, plaintiff had told Delores Rue something had gone wrong with the procedure, and according to the testimony

of plaintiff's husband, within three days of leaving the hospital, plaintiff knew something was wrong with the right side. Defendants argue that at this point, she clearly ascribed her pain to the bone marrow procedure, she knew Dr. Gruenberg was responsible for operating on the side that was causing her pain, and she knew something had "gone wrong in the procedure," and that the pain had lasted "longer than what I had thought would be the normal healing time," --*i.e.*, she was aware of the tortious conduct element of the injury.

Defendants contend that under <u>Gaston</u>, an untoward result after surgery can put a reasonable person on notice of tortious conduct. 318 Or. at 256. So, they argue, even if plaintiff did not have knowledge of her injury during the conversation with Dr. Segal on the day of her surgery or during the second conversation with Ms. Rue, she clearly discovered her injury on February 2, 2001, when Dr. Segal told her that she had likely sustained a nerve injury during the procedure. They contend that as a result of Dr. Segal's statement, plaintiff had actual knowledge of a "substantial possibility or tortious conduct," because she already knew Dr. Gruenberg had done the procedure on her right side.

I disagree with defendants' argument. While the evidence establishes two of the elements, harm and causation, there is a genuine issue of fact with respect to the tortious conduct.

Plaintiff knew that there was a problem with her right side, the side Dr. Gruenberg had operated on, and knew as of February 2001 from Dr. Segal that she had likely sustained a nerve injury. However, a jury could nevertheless reasonably conclude that plaintiff had no basis for attributing her injury to tortious conduct, because the Red Cross consent form she signed specifically stated that possible complications from the donation included pain or numbness in a leg, bleeding at the collection site, "more severe pain than usual," and nerve damage-- the very symptoms plaintiff experienced.

Moreover, Dr. Segal told plaintiff her symptoms would gradually improve over time. A physician's assurances can have bearing on whether a reasonable person would be aware of the substantial possibility of tortious conduct. Gaston, 318 Or. at 258. Dr. Segal did not tell plaintiff of Dr. Gibbs's findings, and did not follow Dr. Gibbs's recommendation that she be treated with Neurontin.

I conclude that there is a genuine issue of fact on the issue of when plaintiff knew or reasonably should have known that her injury was the result of tortious conduct rather than a surgical complication unequated with negligence. Accordingly, defendants' motion for summary judgment based on the statute of limitations is denied.

///

### b. Dr. Segal's motion for partial summary judgment

Plaintiff alleges that Dr. Segal was negligent in performing the marrow extraction procedure; that he failed to warn plaintiff of the risks of the procedure; that he failed to establish policies and procedures to ensure that the procedure was safe; and that he failed to discover the "true nature" of plaintiff's injury. Complaint ¶ 11.

Dr. Segal moves against plaintiff's allegations that he negligently performed the marrow extraction procedure on plaintiff. There is no evidence that plaintiff suffered any pain or medical problems with her left hip, the side on which Dr. Segal operated. Accordingly, Dr. Segal's motion is granted in this part.

### c. Dr. Gruenberg's motion for partial summary judgment

Plaintiff alleges that Dr. Gruenberg was negligent in performing the marrow extraction procedure; that he failed to warn plaintiff of the risks of the procedure; that he failed to establish policies and procedures to ensure the bone marrow procedure was safe; and that he failed to discover the "true nature" of plaintiff's injury. Complaint ¶ 10.

Plaintiff has conceded her failure to warn claim as to Dr. Gruenberg. Dr. Gruenberg moves against plaintiff's specification that he failed to discover the "true nature" of her injury, because Dr. Gruenberg played no role in plaintiff's follow up

care. Dr. Gruenberg argues that because he never had any contact with plaintiff after the procedure, plaintiff cannot establish the facts necessary to prove a claim that Dr. Gruenberg was negligent in failing to discover the true nature of plaintiff's injury.

Plaintiff counters that a genuine issue of material fact exists because under Oregon law, when physicians are acting in concert, they are both liable for the negligence of the other, see Sprinkle v. Lemley, 243 Or. 521 (1966)).

Plaintiff has proffered no evidence that Doctors Segal and Gruenberg were acting in concert with respect to her follow-up care, and there is no evidence that Dr. Gruenberg was involved in plaintiff's follow-up care. Accordingly, there is no evidence that Dr. Gruenberg could have had a role in discovering the true nature of plaintiff's injury.

Dr. Gruenberg's motion for summary judgment on this specification of negligence, and on the failure to warn (which was conceded) is granted.

## Conclusion

Defendants' motions for summary judgment based on the statute of limitations (doc. ## 33, 38, 42) are DENIED. Dr. Segal's motion for summary judgment on the claim that he negligently performed the bone marrow extraction procedure (doc. # 33) is GRANTED. Dr. Gruenberg's motion for summary judgment on

the claim that he failed to discover the true nature of plaintiff's injury (doc. # 42) is GRANTED.

IT IS SO ORDERED.

Dated this 22nd day of December, 2005.


/s/ Dennis James Hubel
    Dennis James Hubel
United States Magistrate Judge